UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

UNITED STATES OF AMERICA       )
      )
v.       )    NO. 3:14-00090
      )    JUDGE CAMPBELL
JAMAL COOPER, et al.       )

MEMORANDUM AND ORDER

I. Introduction

Pending before the Court are the following motions:

- Motion To Suppress Evidence Obtained Pursuant to Unlawful Wiretaps: TT2, TT3, TT5, And TT6 (Docket No. 433), filed by Defendant Jasmond Foster;

- Motion To Suppress Evidence Obtained Pursuant To Unlawful Wiretaps And To Adopt Memorandum Of Law (DE 433) (Docket No. 457), filed by Defendant Robert Noel;

- Defendant Clifford Woods' Motion To Suppress Evidence Seized Pursuant To Electronic Surveillance And Unlawful Wiretaps: TT2, TT4 And TT6 (Docket No. 460);

- Motion to Suppress Intercepted Communications By Wiretap (Docket No. 464), filed by Defendant Jamal Cooper;

- Motion To Suppress Evidence Obtained Pursuant To Unlawful Wiretaps And To Adopt The Motions And Memorandum Of Co-Defendants Jasmond Foster And Noel Woods (Docket No. 466), filed by Defendant D'Ron Robinson;

- Motion To Join In Defendant's Foster And Woods Motion To Suppress Evidence Obtained Pursuant To Unlawful Wiretaps (Docket No. 467), filed by Defendant Lonald Ector;

- Motion To Suppress Wiretap Evidence And To Adopt Co-Defendant Jasmond Foster's Memorandum Of Law In Support (DE 433) (Docket No. 470), filed by Defendant Darnell Finnels;

- Motion For Leave To Join Co-Defendants' Foster And Woods' Motions To Suppress Evidence Obtained Pursuant To Unlawful Wiretaps (D.E. # 433 And 460) (Docket No. 472), filed by Defendant Sheteeka Bryant;

- Motion To Suppress Intercepted Communications (Docket No 483), filed by Defendant William Earl Foster;

- Defendant Robert Foxx's Motion To Adopt Co-Defendant's Foster, Woods, and Cooper's Motions To Suppress Evidence Obtained Pursuant To Unlawful Wiretaps (Docket No. 484);

- Motion To Suppress Evidence From Wiretaps And Motion To Join Co-Defendants' Motions To Suppress (Docket No. 485), filed by Defendant Eric Williams.

The Government has filed Responses In Opposition (Docket Nos. 455, 500, 503, 504), and Defendant Jasmond Foster has filed a Reply (Docket No. 463).

The Defendants' requests to adopt Co-Defendants' motions and memoranda are GRANTED.

For the reasons set forth herein, the motions to suppress are DENIED.

## II. Factual and Procedural Background

Prior to the filing of the Indictment in this case, on March 31, 2014, the Government sought and obtained an order from Judge William J. Haynes, Jr. of this District authorizing, for a period of 30 days, the interception of communications to and from "Target Telephone 1 (TT1)," believed to be used by Defendant Eric Eugene Williams, and "Target Telephone 2 (TT2)," believed to be used by Defendant Jamal Cooper. (Docket Nos. 455-1, 455-2).

On April 16, 2014, the Government sought and obtained an order from Judge Haynes sealing the discs containing the recordings from TT2 and TT3. (Docket Nos. 455-4, 455-5).[1]

---

[1] The Application For Sealing (Docket No. 455-4) indicates that no conversations were intercepted from TT1 because Defendant Williams discontinued use of the telephone prior to the March 31, 2014 Order authorizing the interceptions. (Id., at ¶ (f)(1), n. 1). The Application indicates that TT3 interceptions were authorized by an Order entered on April 8, 2014. (Id., at ¶ (b)).

2

Through their Motions, the Defendants seek suppression of the contents of all communications recorded during the interception of TT2, and all subsequent wiretap recordings because they were based on the TT2 wiretap.

The Defendants contend that the application for the wiretap failed to establish the requisite necessity, and the TT2 recording was not immediately sealed as required by statute.

Defendant Clifford Woods' Motion To Suppress Evidence Seized Pursuant To Electronic Surveillance And Unlawful Wiretaps: TT2, TT4 and TT6 (Docket No. 460) lists 16 separate grounds for suppression of wiretaps in this case. The Motion is not accompanied by a supporting brief, but seeks to adopt the brief filed by Co-Defendant Jasmond Foster (Docket No. 433). Defendant Foster's brief, however, addresses only a few of the 16 grounds listed in Defendant Woods' Motion. To the extent Defendant Woods' Motion raises grounds that are not discussed in the brief he seeks to adopt, the Motion is DENIED because it fails to comply with Local Criminal Rule 12.01(b)(Pretrial motions "shall be accompanied by a memorandum. . .") Any motions seeking to adopt these same grounds without briefing are denied for the same reason.

## III.  Analysis

### A.  The Necessity Requirement

In order to obtain authorization to use a wiretap, the Government must strictly comply with the requirements set forth in Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2510-2530. See, e.g., United States v. Poulsen, 655 F.3d 492, 503 (6th Cir. 2011); United States v. Alfano, 838 F.2d 158, 161 (6th Cir. 1988). One of those requirements, set forth in Section 2518(1)(c), is that the wiretap application include "a full and complete statement

as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." The purpose of this "necessity" requirement" is to "'assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime' and to prevent wiretapping from being 'routinely employed as the initial step in criminal investigation.'" United States v. Sims, 508 Fed. App'x 452, 456 (6th Cir. Dec. 12, 2012)(quoting United States v. Landmesser, 553 F.2d 17, 19-20 (5th Cir. 1977)). It is not necessary, however, for the Government to prove that "every other conceivable method has been tried and failed or that all avenues of investigation have been exhausted." Alfano, 838 F.2d at 163. See also Poulsen, 655 F.3d at 504. "All that is required is that the investigators give serious consideration to the non-wiretap techniques prior to applying for wiretap authority and that the court be informed of the reasons for the investigators' belief that such non-wiretap techniques have been or will likely be inadequate." Alfano, 838 F.2d at 163-64. See also Sims, 508 Fed. Appx at *456; Poulson, 655 F.3d at 504.

The Affidavit submitted to Judge Haynes in support of the wiretap application for TT1 and TT2 (Docket No. 455-1) is 52 pages long, and was executed and sworn to by Matthew Chance, Special Agent with the United States Drug Enforcement Administration ("DEA") on March 31, 2014. The Affidavit contains information about the target offenses and objectives of the investigation; the persons expected to be intercepted; details of the current investigation, including information provided by eight confidential sources, and five controlled buys; and telephone toll analysis for TT1 and TT2. (Id., at 5-33) The Affidavit then discusses the need for interception and the inadequacy of other investigative techniques, including physical

4

surveillance, pen registers and historic phone tolls, use of grand jury and administrative subpoenas, confidential sources, undercover agents, consensual recordings, witness interviews and arrest warrants, search warrants, trash searches, pole cameras, and tracking devices. (Id., at 33-49).

With regard to physical surveillance, the Defendants contend that the Affidavit's statement of necessity would apply to all drug trafficking cases, and fails to address the particular circumstances of the investigation at issue. The Government argues that the Affidavit clearly and in great detail presents the reasons why physical surveillance was inadequate in the investigation.

In the section of the Affidavit headed "Physical Surveillance," the affiant explained that physical surveillance had been used and gave specific examples of why it was inadequate:

> a) During the controlled purchase with WILLIAMS on September 19, 2013, Agents were conducting physical surveillance on 1123 Meridian Street, Nashville, Tennessee. During this surveillance, one of the Agents overheard and observed a neighbor of WILLIAMS alert WILLIAMS of the Agents' presence in the area (see paragraph 45 of this affidavit). Furthermore, Agents have identified other known cohorts, who reside in close proximity to WILLIAM'S residence, and believe based on observations made by surveillance Agents that these individuals notify WILLIAMS when law enforcement presence was detected.
>
> b) During physical surveillance on WILLIAMS, he has employed acts of counter surveillance, as detailed below, and Agents believe he will continue to employ counter surveillance tactics. For example:
>
>> i. On September 24, 2013, while Agents were conducting surveillance and following WILLIAMS, at approximately 7:00 PM, Agents followed WILLIAMS to several areas of Nashville, Tennessee. WILLIAMS appeared to be conducting counter surveillance techniques by dramatically

5

changing speeds on the interstate, unnecessarily changing lanes, as well as turning down dead end streets and parking for extended periods of time and not exiting his vehicle. These are all known tactics of counter surveillance that are commonly used by narcotics dealers to thwart law enforcement surveillance. In fact, due to these tactics Agents lost WILLIAMS during the physical surveillance.

ii. Agents have been utilizing court authorized GPS electronic tracking devices on WILLIAMS's vehicle and have been monitoring the tracker. Agents have observed WILLIAMS apparently conducting counter surveillance maneuvers. On random checks of the tracker, Agents have observed WILLIAMS taking numerous turns down closely confined streets just to end up back at the same street. Also, during these checks, Agents have observed WILLIAMS take turns down cul-de-sacs and, while never coming to a stop, turn around and drive directly out of the cul-de-sac. These are all obvious and commonly used tactics of counter surveillance being employed by WILLIAMS.

c) Agents have been unable to conduct surveillance on other members of the COOPER DTO because Agents have been unable to identify where they reside. For example, through surveillance Agents believe COOPER distributes controlled substances to individuals who live in Hermitage, Tennessee and Old Hickory, Tennessee. However, due to the residential area and small amount of traffic at these locations, surveillance Agents have been unable to located (sic) the exact residence of these unidentified co-conspirators.

d) Finally, during the investigation, Agents have determined that COOPER has conducted drug transactions inside of businesses in the Nashville area (see paragraphs 46 and 50 of this affidavit). It would be difficult to conduct surveillance at businesses, particularly in such a way as to observe actual transactions, without avoiding detection by the co-conspirators.

83. As members of the organization and the locations they frequent are identified, Agents will continue to make use of physical surveillance. However, physical surveillance, without the benefit of information from wire and electronic

6

interceptions over TARGET TELEPHONE 1 and TARGET TELEPHONE 2, is
unlikely to establish conclusively the roles of the TARGET SUBJECTS or
identify additional co-conspirators or the manner in which they conduct their
daily drug distribution activities. Physical surveillance alone will simply not
enable law enforcement to achieve all of the goals of the investigation.

84. Furthermore, physical surveillance of this drug trafficking organization is
particularly dangerous for law enforcement officers. COOPER DTO members
are associated with the REAL KAMP gang who have a reputation for violence. In
fact, there is evidence that members of REAL KAMP have shot at MNPD
surveillance officers in the past and boasted about doing so (see paragraph 12 of
this affidavit). Therefore, physical surveillance in this investigation is both of
limited value and potentially dangerous for law enforcement.

(Docket No. 455-1, at 36-38).

The Court is persuaded that the Affidavit provides a detailed explanation of the physical

surveillance techniques that were tried and why they were unsuccessful, as well as a detailed

explanation of why investigators believed that physical surveillance would likely be inadequate

and/or too dangerous to obtain the needed information. Defendants' contention that the Affidavit

is full of boilerplate is factually unsupported.

With regard to pen registers and historic phone calls, the Defendants argue that the

Affidavit does not sufficiently explain why pen register data is not useful in the context of this

particular investigation. The Defendants also contend that the affiant "deliberately misleads" the

reader because he states that agents obtained pen registers "in March 2014," when the toll data

was actually for only five days of during the month of March, 2014. (Docket No. 433, at 15).

The Government argues that the Affidavit explains why pen register and historical phone calls

were inadequate in the investigation, and does not contain misleading statements.

The Affidavit addresses the use of "Pen Registers and Historic Phone Tolls" as follows:

85. Agents have utilized historic phone tolls and/or pen register for TARGET
TELEPHONE 1 and TARGET TELEPHONE 2 as investigative methods during

7

this investigation. In March 2014, Agents obtained pen registers and the analysis of pen register/trap and trace information and toll information has been used in this investigation. Toll information and pen register/trap and trace information has provided and will provide valuable information regarding contact between the subjects of the investigation. However, such devices have a limited usefulness in this investigation. Such devices may, in some circumstances, provide information about the identity of members of the organization and the contact between members of the organization. However, these records serve only to confirm a contact between two telephones and cannot definitively confirm the identity of participants in the conversations or the nature or substance of the conversations. Only through the requested wire and electronic surveillance will we be able to know with the (sic) certainty the nature of the telephone conversations between drug dealing members of the COOPER DTO.

86. Furthermore, the usefulness of the pen register/phone toll information is easily thwarted by drug-trafficking organizations. For example, if X calls 555-1212 and speaks to Y, law enforcement may be able to learn the identity of Y through telephone subscriber information. However, if Y has his telephone issued in a fictitious name or declines to provide a name for a pre-paid or pay-as-you-go phone, which based upon my experience is common in drug organizations, law enforcement will not be able to identify Y through the use of pen registers. TARGET TELEPHONE 1 and TARGET TELEPHONE 2, prepaid telephones with no known subscribers, are prime examples of this technique (see paragraph 5 of this affidavit).

87. Even if such devices provide the identity of unknown associates of the organization, pen registers and similar devices rarely succeed in gathering sufficient evidence of the criminal activities under investigation to sustain charges or conviction. For example, they will never provide sufficient information regarding criminal activity in this case to indict because the data collected by pen registers, unlike information obtained from wire and electronic surveillance, does not reveal the content of the conversations between the participants.

(Docket No. 455-1, at 38-39).

The Court concludes that the Affidavit sufficiently explains the limitations of pen registers and historic phone calls both generally, and as they relate to this investigation. As the Affidavit indicates, the pen register/historic phone calls data that was collected during the investigation did not reveal the identity of the participants in the telephone conversations or the substance of the conversations. In addition, the Affidavit points out that both of the target

telephones lacked subscriber information. Defendants' argument that the Affidavit is "deliberately misleading" is factually unsupported.

Defendants argue that the section of the Affidavit relating to the use of a grand jury is also boilerplate, and that the affiant makes the unwarranted assumptions that members of the drug trafficking organization might be reluctant to testify, or to do so truthfully, and might alert them to the existence of the investigation. The Government argues that the Affidavit's description of the difficulties encountered in using grand juries in the experience of law enforcement and prosecutors in general, and in this investigation in particular, adequately demonstrated the need for the requested wiretaps.

In the section titled "Use of Grand Jury and Administrative Subpoenas," the Affidavit provides as follows:

> 88. Based upon Agents' experience, and upon conversations with an Assistant United States Attorney from the Middle District of Tennessee, who has had experience prosecuting violations of criminal law and investigating cases in the Grand Jury, your Affiant believes that the use of Grand Jury subpoenas to bring people believed to be involved in the conspiracy to testify before a federal Grand Jury would not be successful in achieving the goals of this investigation at this time. More specifically, not all of the members of the COOPER DTO have been fully identified, and their whereabouts are unknown. As a consequence, Agents do not have the ability to serve Grand Jury subpoenas on these unidentified individuals. Furthermore, once identified, your Affiant believes that, if the identified members of this conspiracy, their co-conspirators, and other participants were called to testify before the Grand Jury, they would most likely be uncooperative and invoke their Fifth Amendment privilege not to testify. It would be unwise to seek any kind of immunity for these persons, because the granting of such immunity might foreclose prosecution of the most culpable members of this conspiracy and could not ensure that immunized witnesses would provide truthful testimony. Additionally, the service of Grand Jury subpoenas upon the principals of the conspiracy or their co-conspirators would not only alert them to the existence of this investigation, causing them to become more cautious in their activities, but may also cause them to flee to avoid further investigation or prosecution, to threaten the lives of the informants, or to otherwise compromise this investigation. Threats to informants is particularly disconcerting to law

9

enforcement in this investigation because members of the COOPER DTO have violent reputations and some of those that know COOPER DTO members are reluctant to testify (see paragraphs 11, 12, 32, and 38 of this affidavit).

89. Furthermore, the service of Grand Jury subpoenas to apparent custodians of records for businesses associated with the sale of issuance of cellular telephone numbers would not likely result in identifying other members of the COOPER DTO, due to the routine practice of providing no or misleading subscriber information when such telephones are acquired. Such an approach could result in having individuals employed at such locations notify the actual participants about law enforcement's interest in such telephone numbers.

(Docket No. 455-1, at 39-40).

The Court is persuaded that the Affidavit adequately explains the shortcomings associated with the use of grand juries generally, and why those shortcomings apply to this investigation. For example, the affiant points out that the participants in the Cooper drug trafficking organization have violent reputations making potential witnesses reluctant to testify, and specifically refers to two confidential informants who stated as much (see paragraphs 32 and 38). Defendants' suggestion that an investigative technique must be used even if it is unlikely to succeed, and is indeed potentially dangerous, is not supported by case law. See United States v. Sims, 508 Fed. Appx, at 457 (Government is not required to exhaust every other investigative avenue to satisfy the necessity requirement).

With regard to confidential sources, the Defendants contend that the Affidavit fails to explain why four of the eight confidential sources used by investigators were unable to provide future assistance, and what steps investigators took to develop new informants. The Government argues that the information in the Affidavit is more than sufficient to explain the limitations on the use of confidential sources.

The "Confidential Sources" section of the Affidavit provides as follows:

10

90.  To date, the use of confidential sources in this investigation has not proven to be an effective alternative to the interception of wire and electronic communications over TARGET TARGET (sic) TELEPHONE 1 and TARGET TELEPHONE 2. Although Agents have identified and used several confidential sources in this investigation with some success to gather historical information regarding the COOPER DTO and to purchase narcotics from members of the organization, those confidential sources' roles in furthering the investigation are limited. It is unlikely that the confidential sources will be able to obtain the information necessary to reveal the interior workings of COOPER DTO activities or identify all of the sources or narcotics supply used by WILLIAMS and COOPER.

91.  As previously discussed, eight confidential sources have been useful in gathering some evidence of the criminal activities of the COOPER DTO. Nevertheless, I believe the wiretap authorization requested herein is necessary to achieve all of the goals of this investigation I will discuss the limitations of the usefulness of the confidential sources in the following paragraphs:

      a.  <u>CS-1</u>   As stated above, CS-1 was only able to provide information and engage in controlled buys regarding FOXX.  CS-1, while remaining an active CS, is unable to advance the investigation any further, does not even know WILLIAMS or COOPER, and does not have any insider information about how the COOPER DTO operates.

      b.  <u>CS-2</u>   CS-2 provided information about DYCHE and engaged in a controlled buy from DYCHE.  CS-2 is an active CS, but is no longer in a position to contact members of the COOPER DTO. CS-2 now adds little to the investigation. Further, CS-2 was not able to buy directly from WILLIAMS or COOPER and did not have any information about the other drug trafficking members of the COOPER DTO. CS-2 is of no help in identify (sic) the California source of supply or other sources of controlled substance supply.

      c.  <u>CS-3</u>   CS-3 provided useful information about FOXX's drug trafficking activities.  CS-3 knew WILLIAMS, but did not even know his name and only met COOPER on one occasion. Further, CS-3 is still incarcerated and unable to provide any other information, to include up to date information, about the COOPER DTO.

      d.  <u>CS-4</u>   CS-4 provided information regarding only WILLIAMS and COOPER.  He did not have information about other members

11

of the COOPER DTO.  Notably, CS-4 had no information about the identity of COOPER and WILLIAMS's sources or narcotics supply or how COOPER and WILLIAMS obtain their controlled substances. CS-4 is an active CS but no longer has contact with the COOPER DTO.

e.  CS-5  CS-5 provided information about FOXX and HANCOCK and even furthered the investigation by, at the direction and under the supervision of law enforcement, engaging in multiple controlled buys from FOXX.  While initially helpful to the investigation, CS-5 will not be able to further the investigation from this point forward and has lost contact with COOPER DTO members.  FOXX and HANCOCK appear to be mid-level distributors of heroin and CS-5 does not know that WILLIAMS and COOPER supply them with heroin for further distribution. CS-5 does not have any information about the out of state sources of heroin supply for the COOPER DTO.

f.  CS-6  CS-6 provided useful information about ROBERTS and WILLIAMS and conducted a controlled buy from WILLIAMS. However, CS-6 is no longer cooperating with law enforcement and Agents are unable to even get in contact with CS-6.  CS-6 is no longer an active CS and cannot further the investigation.

g.  CS-7  CS-7 provided information about several members of the COOPER DTO.  CS-7 also informed law enforcement that COOPER has many out of state sources of controlled substance supply and detailed the state and/or city where COOPER obtains heroin. However, the information CS-7 provided law enforcement has its limits. First, CS-7 is reluctant to ever testify and is afraid of COOPER. Second, CS-7 was not able to provide specificity which would allow law enforcement to identify the sources of supply or when and how COOPER and/or WILLIAMS are able to coordinate the transport of the heroin into Tennessee. CS-7 is a good source of information and will continue to be used by law enforcement to further this investigation, but only the requested wire and electronic communications will allow law enforcement to build a prosecutable case against all members of the COOPER DTO and the out of state sources of heroin supply.

h.  CS-8  CS-8 is an active informant and provided information about COOPER, WILLIAMS, and DYCHE. CS-8 provided valuable information, but is reluctant to testify because of COOPER's violent reputation. Like CS-7, CS-8 noted that

12

COOPER obtains heroin from multiple out of state sources, but CS-8 was also unable to provide specificity as to who supplies COOPER or even the exact area of a city where COOPER's sources frequent. Therefore, CS-8's cooperation is also of limited value. Law enforcement will continue to use CS-8 as a source of information, but CS-8's cooperation will not allow law enforcement to identify all members of the COOPER DTO and build prosecutable cases against them.

92. Based upon my training and experience, even if the confidential sources could provide information that would result in an additional seizure or purchase of heroin or the seizure of illegal drug proceeds from members of the organization, such a seizure or purchase alone could not provide adequate evidence to identify or prosecute more than a select few of the associates of this investigation. As proven in numerous criminal investigations of drug trafficking organizations, drug distributors conduct business in such a manner as to prevent more than one or two individuals actually coming in physical contact with the narcotics or money during any given transaction.

93. In addition to the fact that very few subjects would be identified and prosecuted as the result of the activity of a confidential source(s), the subjects of this investigation could either flee the area or change addresses and cellular telephones soon after law enforcement Agents seize drugs or money from anyone even remotely connected to this organization. Accordingly, your Affiant believes that an individual seizure of drugs, or illegal drug proceeds, however small or large, executed without this requested electronic interception, would not accomplish the stated goals of this investigation, and would only cause the members of this organization to take steps to further insulate themselves from law enforcement investigation. In sum, your Affiant believes that cooperating sources have a limited value to assisting Agents in further identifying and disrupting the organization's narcotics trafficking activities.

94. For the reasons stated above, the exploitation of currently identified cooperating sources would not achieve all of the goals of the investigation, and is not, therefore, presently an alternative to the wire surveillance requested herein. However, I will continue to utilize the current cooperating sources, and attempt to identify new cooperating sources, as opportunities arise.

(Docket No. 455-1, at 40-44).

The Court concludes that the Affidavit is sufficient as it details the investigators' use of

eight confidential informants during the investigation, and explains why the use of such

13

informants likely would not yield the needed information about the higher level members of the organization and the sources of its drug supplies. Defendants' argument that investigators should have recruited more than these eight confidential sources, and that these confidential sources could have provided the needed information, is not persuasive.

With regard to undercover agents, the Defendants argue that the Affidavit is inadequate because it overstates the risk of exposure and danger, and defines the goals of the investigation too broadly. The Government argues that the Affidavit appropriately relies on the experience of investigators in investigating gangs and drug trafficking organizations generally, and in investigating the Cooper drug trafficking organization specifically.

The "Undercover Agents" section of the Affidavit provides as follows:

95. Agents believe it would be extremely difficult and potentially dangerous for an undercover agent to initiate an undercover operation into the COOPER DTO. Additionally, the role of undercover officer is limited due to the presumably close-knit nature of this group and the fact that it would not be possible for an undercover officer to penetrate the upper levels of the conspiracy and identify all members of the conspiracy and their respective roles. Generally, members of narcotics trafficking organizations are experienced at their respective roles and only deal with long-time associates. In addition, as detailed above, because members of the COOPER DTO drug trafficking organization appear to utilize counter-surveillance techniques and are part of the REAL KAMP criminal street gang (formed in prison), it would be incredibly difficult to protect the safety of an undercover officer operating from within the organization (see paragraphs 11-12 of this affidavit).

96. Further, several members of the COOPER DTO have been arrested for controlled substance violations, have been incarcerated previous, and have refused to cooperate with law enforcement in the past, thereby earning each other's trust and gaining each other's loyalty. Hence, it would not be possible for an undercover officer to penetrate the upper levels of the conspiracy and identify all members of the conspiracy and their respective roles. Generally, members of narcotics trafficking organizations are experienced at their respective roles and only deal with long-time associates. They are extremely suspicious of newly developed associates, and it would take an extraordinary amount of time to develop an entry level relationship. Accordingly, the use of undercover agents

14

will not meet the objectives of this investigation and is not a viable alternative to the wire and electronic surveillance of TARGET TELEPHONE 1 and TARGET TELEPHONE 2.

(Docket No. 455-1, at 44-45).

The Court is persuaded that the Affidavit adequately explains that the use of undercover agents would be likely to risk premature exposure of the investigation, and would likely put officers at risk of harm. The Affidavit explains that the Cooper drug trafficking organization is suspicious of newcomers, and is comprised of members who have proved their loyalty to the organization through previous incarceration and refusal to cooperate with law enforcement. The Affidavit further explains the violent nature of the organization members who are also part of the Real Kamp criminal street gang. Paragraph 12 of the Affidavit, referenced in this section, states that a member of Real Kamp is suspected to have shot at Gang Unit detectives while they were conducting surveillance, and that later, his brother posted a rap song on the internet in which he boasts of shooting at the Gang Unit. (Docket No. 455-1, at 10-11). Defendants' contention that the goals of the investigation were stated too broadly is not persuasive.

Defendants argue that the consensual recordings section of the Affidavit is inadequate because confidential sources may be willing to call targets even if they are afraid to testify, and undercover agents may be able to initiate phone calls. The Government argues that the Defendants' suggestions are impractical and are not supported by sound investigative techniques.

The "Consensual Recordings" section of the Affidavit provides as follows:

97.   In the course of this investigation, consensual recordings have been made using confidential sources; however, since consensual recordings are merely recorded conversations of an undercover or confidential source, they are subject to the same limitations described above and could not meet the objectives of this investigation.

(Docked No. 455-1, at 45).

The Court concludes that the Affidavit is sufficient in that it indicates that consensual recordings have been made during the investigation, and explains why the use of such recordings depends upon the ability of the person recording – the confidential source or undercover agent – to elicit the needed information. As set forth above, the affiant had already discussed in detail the limitations on the use of confidential sources and undercover agents. Defendants' suggestion that recordings could be made in spite of these obstacles is not persuasive.

Defendants argue that the section of the Affidavit addressing interviews of witnesses and arrest warrants is false and misleading because it suggests that members of the drug trafficking organization have shown a propensity to warn others of the presence of law enforcement. The Government argues that the Affidavit is not false, and sufficiently explains why interviews and arrest warrants would likely fail.

The section of the Affidavit titled "Interviews of Witnesses and/or Subjects and Arrest Warrants" provides as follows:

> 98. The likelihood of success in using interviews of independent witnesses, cooperating individuals, TARGET SUBJECTS, or their known associates as an alternative to the electronic surveillance requested is minimal. The most knowledgeable subjects are also participants in the crimes under investigation and would be unlikely to cooperate and provide information without 'tipping off' their co-conspirators. Contact with active members of the COOPER DTO could, and your Affiant believes would, compromise the entire investigation absent some degree of confidentiality. Your Affiant believes that interviews of co-conspirators in this matter would be communicated to the principals or their subordinates or others who would take additional precautionary steps to avoid the collection of evidence by law enforcement. Members of the COOPER DTO and their associates have already shown a propensity for alerting others to the presence of law enforcement (see paragraph 45 of this affidavit).

> 99. Moreover, it is believed by your Affiant that any persons associated with the COOPER DTO who are arrested may have reason to fear retaliation against

themselves or their families if they were to cooperate with authorities due to the violent reputation of members of the organization and affiliation with REAL KAMP (see paragraphs 11, 12, 32, and 38 of this affidavit).

100.   In sum, seeking arrest warrants at this time would be premature. Your Affiant does not know whether the above-referenced individuals would cooperate with the United States.  Further, even if these individuals did cooperate with the United States, your Affiant does not think that would achieve the principal objectives of the investigation as identified in this Affidavit.

(Docket No. 455-1, at 45-46).

The Court concludes that the Affidavit is not false or misleading, and that it adequately explains why interviews and arrest warrants would likely fail to produce the needed information. The Affidavit's statement that organization members would likely alert others if they were approached by law enforcement is supported by Paragraph 45 of the Affidavit, which details surveillance of Defendant Williams and Dyche in which they "seemed to be alerted to the presence of law enforcement by a neighbor." (Docket No. 455-1, at 21-22).  The Affidavit adequately explains why investigators believe that interviews would likely lead to premature exposure of the investigation, and would likely be unsuccessful, in any event, given the fear of retaliation instilled in potential witnesses by the reputation of the organization for violence.

Defendants argue that the search warrants section of the Affidavit is inadequate because investigators did not execute any search warrants before making the wiretap request. The Government argues that the Affidavit sufficiently explains why search warrants would be unlikely to succeed.

The "Search Warrants" section of the Affidavit provides as follows:

101.   Based upon your Affiant's experience and that of other law enforcement Agents, the use of search warrants is unlikely to produce sufficient evidence to determine the full nature and scope of the criminal conspiracy, the identity of all participants, and/or their methods of operation. Agents likely have enough

17

probable cause to execution (sic) a search warrant at WILLIAMS' mother's residence located at 1123 Meridian Street, Nashville, Tennessee; however, the execution of search warrants would 'tip off' targets of the investigation, causing them to curtail or conceal their activities and bring the investigation to an unsuccessful and premature conclusion. Furthermore, Agents have not yet identified the locations that they use for storage/distribution of drugs and drug proceeds within the Middle District of Tennessee. Based upon the foregoing, your Affiant believes that it would be more productive to execute search warrants at the conclusion of this investigation, once these locations have been established and the other goals of the investigation have been substantially achieved.

(Docket No. 455-1, at 46).

The Court is persuaded that the Affidavit adequately explains why the execution of search warrants would be unlikely to further the investigation. The Affidavit explains that execution of search warrants would reveal the existence of the investigation, leading the participants to curtail or conceal their activities from investigators. The Affidavit further explains that with the exception of Williams' mother's residence, investigators had not yet identified the other locations used for the storage of drugs and/or proceeds. Defendants' suggestion that investigators were required to attempt an ill-advised investigative technique in order to establish necessity is not supported by case law. See United States v. Sims, supra.

Defendants argue that the section of the Affidavit discussing trash searches is inadequate because it does not explain why investigators did not conduct a trash search at Defendant Williams' residence or the residences of other organization members, or why trash searches could not be done surreptitiously to avoid detection. The Government contends that the Affidavit sufficiently explains why trash searches are a limited investigative option.

The "Trash Searches" section of the Affidavit provides as follows:

102.   Agents have conducted trash searches during this investigation, as detailed below. However, Agents believe that it would be of limited value to conduct a trash search on WILLIAMS's residence because he frequently stays in hotels in

the Nashville area. Furthermore, Agents have knowledge that WILLIAMS conducts a lot of his narcotics distribution from his mother's residence at 1123 Meridian Street, Nashville, Tennessee. Agents have conducted several trash searches at this location during this investigation that has resulted in the same probative evidence of drug trafficking. These trash searches have yielded numerous items of repackaging material that contained evidence of heroin and other drugs consistent with narcotics resale. Agents have conducted trash searches at known associates of WILLIAMS that have been identified as being a part of the conspiracy. From one specific trash search of an associate, Agents recovered two (2) kilogram size wrappers that contained heroin residue along with several baggies with the corners torn off, which is consistent with narcotics repackaging for resale. Surveillance units were able to place WILLIAMS at the location of the trash search within several days prior to the trash search. WILLIAMS' residence of 1123 Meridian Street, Nashville, Tennessee is located in a very populated, high traffic area, where residents know who lives and visits the area. In addition, some residents' attitude is unfavorable towards police and could alert WILLIAMS to their presence, as detailed in paragraph 88(a) above. Thus, Agents pulling trash in any of these areas could compromise the entire investigation. Further use of trash searches cannot be considered at this point in the investigation as a viable alternative to wire and electronic surveillance of TARGET TELEPHONE 1 and TARGET TELEPHONE 2. It is your Affiant's belief that the risk of exposing the investigation by law enforcement and the potential danger to law enforcement and others is very high while attempting to conduct a trash search. Furthermore, as previously stated, law enforcement has not yet identified all of the locations where all of the members of the COOPER drug trafficking organization live, or the locations that they use for storage/distribution of drugs and drug proceeds, making it impossible to search the trash of these locations. Trash searches may yield evidence of drug trafficking, but certainly would not, alone, result in achieving the extensive goals of the investigation.

(Docket No. 455-1, at 46-47).

The Court concludes that the Affidavit is sufficient in that it describes the trash searches conducted during the investigation, and explains why additional trash searches would be problematic. The Affidavit states that several trash searches had been conducted at the residence of Defendant Williams' mother, which had yielded evidence of drug trafficking. The Affidavit further states that trash searches had been conducted at the residences of Defendant Williams' co-conspirators, which had also yielded some evidence of drug trafficking. The Affidavit

19

explains, however, that conducting trash searches at Williams' residence, given its location, would risk exposure of the investigation and could put investigators in danger. Evidence from trash searches, the Affidavit further explains, does not provide the type of information that can be gained from electronic surveillance. Defendants' arguments that investigators should have made more use of trash searches is unavailing.

Defendants argue that the section of the Affidavit discussing pole cameras is inadequate because only one pole camera was used. The Government argues, on the other hand, that the Affidavit sufficiently explains the limitations on the use of this investigative technique.

The section of the Affidavit titled "Pole Cameras" provides as follows:

103.  Agents have installed a pole camera on Meridian Street facing the front of 1123 Meridian Street, Nashville, Tennessee, which is the residence of WILLIAMS's mother. Agents have discovered that WILLIAMS uses this residence to distribute his narcotics. Using this pole camera, Agents have witnessed at this location what are believed to be drug transactions. Due to the limitations of the pole camera; however, it would be difficult to learn information about the inner workings of the COOPER DTO, such as the quantities and types of controlled substances involved. Specifically, Agents believe that most of the drug transactions occur inside the residence or out of the view of the pole camera.

104.  In addition, Agents have been able to identify other co-conspirators of the COOPER drug trafficking organization from viewing the pole camera while conducting physical surveillance at the same time. Agents have observed vehicles arrive at WILLIAMS' mother's residence while WILLIAMS is present at the location, stay for a short period of time, and then leave the location. Agents believe this to be narcotics related activity. However, Agents still have not been able to determine the quantity and the types of controlled substances involved from these meetings. Pole camera surveillance will continue to be used, but only when used in conjunction with the requested wire and electronic surveillance, will this investigative technique result in achieving the goals of the investigation.

(Docket No. 455-1, at 47-48).

The Court is persuaded that the Affidavit contains a sufficient description of the investigators' use of pole cameras, and the reason why additional pole cameras would not enable

20

investigators to obtain the information sought. The Affidavit states that a pole camera was placed at the residence of Defendant Williams' mother, and through its use, investigators had witnessed what they believed to be drug transactions. The Affidavit then explains, however, that pole cameras do not provide investigators with information relating to the quantity and types of controlled substances involved. Though they argue that additional pole cameras should have been used, the Defendants have not explained how they would have provided this information.

Defendants argue that the section of the Affidavit discussing tracking devices is inadequate because there is no explanation of why a tracking device was not placed on Defendant Cooper's vehicle. The Government contends that the Affidavit explanation is more than sufficient.

The section of the affidavit titled "Tracking Devices" provides as follows:

105.   During the course of this investigation, Agents have utilized GPS electronic tracking devices on vehicles driven by WILLIAMS and other members of the COOPER drug trafficking organization. From September of 2013 to March 2014, Agents installed approximately eight (8) court authorized electronic tracking device on vehicles driven by WILLIAMS. WILLIAMS drives rental vehicles and consistently switches to a different vehicle after a period of time. Agents believe this is a method for WILLIAMS to avoid surveillance and to thwart law enforcement's effort. Although Agents have used the tracking devices to observe the locations WILLIAMS has been to, the tracking device could not provide any detailed information about a drug transaction, even if it were to occur in a vehicle that was being tracked.

106.   Agents have used GPS tracking of telephones used by WILLIAMS and COOPER to further the investigation. For example, through tracking of the telephones, Agents were able to confirm that both WILLIAMS and COOPER traveled to California, apparently to obtain an amount of heroin (see paragraphs 68-69 of this affidavit). While this evidence is probative, it does not rise to the highly probative level of evidence that the requested wire and electronic intercepts would yield. Therefore, he (sic) tracking devices alone will only provide limited information and will not provide sufficient evidence to meet the goals of this investigation without the benefit of court-authorized monitoring of TARGET TELEPHONE 1 and TARGET TELEPHONE 2.

21

(Docket No. 455-1, at 48-49).

The Court concludes that the Affidavit contains a sufficient explanation of the use that has been made of tracking devices, and the reason why additional use of tracking devices would not enable investigators to obtain the information sought. The Affidavit states that eight tracking devices had been used on Defendant Williams' vehicles, and that tracking devices had been used on telephones used by Defendant Williams and Cooper. In addition, the Affidavit explains that tracking information does not provide detailed information regarding particular drug transactions. Despite Defendants' argument to the contrary, the "necessity" requirement does not demand that investigators explain the failure to attach a tracking device to Defendant Cooper's vehicle.

Having considered the Affidavit's statement of the necessity for the wiretaps, and the Defendants' challenges, the Court concludes that the Affidavit fully satisfies Section 2518(1)(c).

B.  The Sealing Requirement

Defendants alternatively argue that the wiretap recordings should be suppressed because the Government failed to make the TT2 recordings immediately available to Judge Haynes for sealing as required by statute. The Government contends that the recordings were sealed as required.

Section 2518(8)(a) provides, in pertinent part, as follows:

(8)(a) The contents of any wire, oral, or electronic communication intercepted by any means authorized by this chapter shall, if possible, be recorded on tape or wire or other comparable device. The recording of the contents of any wire, oral, or electronic communication under this subsection shall be done in such a way as will protect the recording from editing or other alterations. Immediately upon the expiration of the period of the order, or extensions thereof, such recordings shall be made available to the judge issuing such order and sealed under his directions. . . . The presence of the seal provided for by this subsection, or a satisfactory

22

explanation for the absence thereof, shall be a prerequisite for the use or disclosure of the contents of any wire, oral, or electronic communication or evidence derived therefrom under subsection (3) of section 2517.

The Order authorizing the TT1 and TT2 wiretaps, executed on March 31, 2014, provides that "the interception of wire and electronic communications authorized must terminate upon attainment of the authorized objectives or, in any event, at the end of thirty (30) days measured from the day on which investigative or law enforcement officers first begin to conduct interception or ten (10) days from the date of this Court's Order, which occurs first." (Docket No. 455-2, at 4).

Subsequent to the issuance of the wiretap authorization Order, Assistant United States Attorney Matthias D. Onderak presented to Judge Haynes an Application For Sealing Of Wire And Electronic Communications (Docket No. 455-4), relating to TT2 and TT3 and dated April 16, 2014.[2] The Application requests the sealing of one optical disc containing recorded interceptions of TT2 between March 31, 2014 and April 12, 2014. (Id., at ¶ (a)). The Application states that the interception of communications on TT2 began on March 31, 2014 and stopped on April 12, 2014 because Defendant Cooper stopped using TT2. (Id., at ¶ (f)(2)).[3] By

---

[2] As noted above, the Application indicates that there were no interceptions of TT1 because Defendant Williams discontinued use of the telephone prior to the March 31, 2014 Order authorizing the interceptions. (Id., at ¶ (f)(1), n. 1). The Application indicates that TT3 interceptions were authorized by an Order entered on April 8, 2014. (Id., at ¶ (b)).

[3] The Application also requests the sealing of one optical disc containing recorded interceptions of TT3 between April 8, 2014 and April 11, 2014. (Id., at ¶ (b)). The Application states that the interception of communications TT3 began on April 8, 2014 and stopped on April 11, 2014 because Defendant Williams stopped using it. (Id., at ¶ (f)(6)). The Defendants do not appear to challenge the timeliness of the TT3 sealing.

Order entered April 16, 2014 (Docket No. 455-5), Judge Haynes sealed the optical discs containing the recorded interceptions of TT2 and TT3.

The Defendants argue that the TT2 recording was not sealed "immediately" as required by statute because the date of the last interception was on April 12, 2014 and the recording was not sealed until April 16, 2014. The Defendants and the Government appear to agree that case law defines "immediately" as "one to two days," relying principally on United States v. Wilkinson, 53 F.3d 757 (6th Cir. 1995). The Government contends, however, that the time is measured from the expiration of the authorizing order, and that the recordings at issue was sealed *before* the expiration of the authorizing order when investigators determined that the telephone was no longer being used. The Defendants argue that the time is measured from the time the order's objectives are achieved, which they contend occurred on April 12, 2014, the date of the last recorded communication.

In Wilkinson, the Sixth Circuit held that, based on an authorization order similar to the one entered here, the time should be measured from the date the last communication was intercepted because the objective of the order had been achieved on that date. 53 F.3d at 759-60. The recording at issue in Wilkinson was made from a device placed in the briefcase of a cooperating witness, and contained statements made during a meeting on January 7, 1992. 53 F.3d at 759-62. The court held that "[g]iven that the briefcase was only used to intercept communications on January 7 and the nature of the communications intercepted," the objective of the authorization order had been achieved on January 7, 1992. 53 F.3d at 760.

Assuming the authorization order for TT2 expired when Defendant Cooper discontinued use of TT2 because the objectives of the order had been achieved, the Court concludes that such

24

a determination did not occur until after April 13, 2014. The Government represents that the last recording on the telephone occurred on April 12, 2014, and that investigators monitored the telephone on April 13, 2014 and determined that Defendant Cooper did not make any outgoing calls on the phone and incoming calls were not answered. (Docket No. 503, at 2). Investigators could not be expected to realize that a telephone is no longer being used – and that the objectives of the interception authorization order have been achieved – without monitoring the telephone for some period of time after the last recorded call to determine that it is no longer being used. It was not unreasonable for investigators to monitor the telephone for a day to make that determination. The sealing application was made and granted two days later. Accordingly, the Court is persuaded that the sealing order on April 16, 2014 satisfies the statutory requirement that the recording be sealed "immediately."

C.  Subsequent Wiretap Applications

The Defendants argue that because subsequent wiretap applications relied on evidence illegally obtained from TT2, all the evidence obtained from those successive wiretaps is fruit of the poisonous tree, and must be suppressed. As the Court has found that Defendants' challenges to the TT2 wiretap are without merit, their challenge to subsequent wiretaps is also without merit.

D.  Standing

 As the Court has determined that the wiretaps in this case are in compliance with the statute, it is unnecessary to consider the Government's argument that certain Defendants lack standing to challenge the wiretaps.

IV.  Conclusion

For the reasons set forth herein, the Defendants' motions challenging the wiretaps in this case are denied.

It is so ORDERED.

_Todd Campbell_
TODD J. CAMPBELL
UNITED STATES DISTRICT JUDGE